UNITED STATES *v.* HENSEL, BRUCKMANN & LORBACHER, INC.

No. 7949.—

Entry No. 754799.

Third Division, Appellate Term

(Decided February 6, 1951)

*David N. Edelstein,* Assistant Attorney General (*Samuel D. Spector,* special attorney), for the appellant.

*Eugene R. Pickrell* (*Eugene R. Pickrell* and *Michael Stramiello, Jr.,* of counsel) for the appellee.

Before CLINE, EKWALL, and JOHNSON, Judges

CLINE, Judge: This is an application for review of the decision and judgment of the court below, holding that a so-called license fee was not a part of the statutory cost of production of the merchandise involved herein. *Hensel, Bruckmann & Lorbacher, Inc.* v. *United States,* 24 Cust. Ct. 603, Reap. Dec. 7825.

The merchandise consists of four printing machines, known as Transkrit machines, exported from Switzerland on May 9, 1942. They were invoiced at a unit price of 22,000 RM, which amount included a license fee of 10,000 RM payable by Transkrit Corporation to Transkrit A. G. The machines were entered at a value of 12,000 RM each, plus packing, and were appraised at 22,000 RM each, plus packing, on the basis of cost of production.

At the trial both oral and documentary evidence were introduced. Plaintiff's exhibit 1 is an affidavit of E. Hodler, managing director of Transkrit A. G. of Zurich, Switzerland, dated September 23, 1947. It appears therefrom that the affiant is the inventor of the Transkrit machine; that Transkrit A. G. is the owner of the patents covering the machines; that Maschinen-Fabrik Augsburg-Nurnberg A. G. of Augsburg, Germany (hereinafter called Maschinen-Fabrik), was until September 1942 the sole manufacturer of such machines; that it receives orders for the manufacture of the machines from Transkrit A. G. and ships them directly to the customers; that Transkrit A. G. offers for sale and sells them for home consumption in Germany and for export to the United States and to other foreign countries at a price of 22,000 RM, the sum of 12,000 RM being paid to Maschinen-Fabrik as the purchase price and the sum of 10,000 RM being paid to Transkrit A. G. as a license fee; that every purchaser of a Transkrit machine is given a certain specified territory in which he has exclusive license to operate the machines and a fee of 10,000 RM per machine is paid for this license; that in addition thereto, a royalty of 5 per centum of the sales price of the output of the machine is paid for the use thereof. In connection with the instant merchandise, the affiant states that the price was 22,000 RM per machine; that that price included a license fee of 10,000 RM per machine for territorial rights in the United States for Transkrit Corporation, New York; that the license fee was paid by Transkrit Corporation to Maschinen-Fabrik for account of Transkrit A. G., and the amount of 12,000 RM was paid to said Maschinen-Fabrik; that Transkrit A. G. received the license fee of 10,000 RM per machine from Maschinen-Fabrik; that Transkrit Corporation pays Transkrit A. G. a royalty of 5 per centum of the sales price of the output of each machine for the right to use them in the United States; that Transkrit A. G. did not receive any part of the 12,000 RM per machine which was paid to Maschinen-Fabrik; that Maschinen-Fabrik did not receive any portion of the 10,000 RM per machine which is the license fee for territorial rights for those machines in the United States.

Plaintiff's collective exhibit 2 is an affidavit of Franz H. Hausenblas, mechanical engineer of Maschinen-Fabrik, dated March 24, 1948. The affiant states therein that from November 7, 1933, to the date of the affidavit, he supervised the production and sales of all Transkrit

machines produced or manufactured by Maschinen-Fabrik; that such machines are not sold or offered for sale for home consumption in Germany by Maschinen-Fabrik; that Transkrit A. G. is the owner of the patents and is the only concern which sells or offers to sell such machines for home consumption or use in Germany; that Maschinen-Fabrik was the sole manufacturer of such machines until September 1942; that it receives orders from Transkrit A. G. for the manufacture of them and ships them directly to the purchasers; that no other concern in Germany manufactures such machines; that the following is the cost of manufacture:

A. The cost of materials, and of fabrication, manipulation or other process employed in the manufacture or production is _____

Reichsmarks, per Transkrit machine.                       4. 900, – R. M.

B. Usual general expenses are _____

Reichsmarks, per Transkrit Machine.                       5. 700, – R. M.

C. The cost of all containers and coverings is _____

Reichsmarks, per Transkrit machine.                       _____ R. M.

D. The addition for profit is _____

Reichsmarks, per Transkrit machine.                       1. 400, – R. M.

E. The total cost of production is _____

Reichsmarks, per Transkrit machine.                       12. 000, – R. M.

Plaintiff's exhibits 3–A to 3–L consist of an affidavit of Ernst Hodler, dated January 7, 1949, copies and translations of contracts and correspondence between Transkrit A. G. and Messrs. Neubauer, and an agreement between Transkrit Co. Dr. Hodler & Co. and Transkrit Corporation. Plaintiff's exhibit 3–B is a contract, dated November 10, 1936, between Transkrit A. G. and Messrs. Sigmund and Richard Neubauer, granting to Messrs. Neubauer, Transkrit license rights for the State of New York, provided a machine is ordered, and for the State of Illinois, provided another machine is ordered. Plaintiff's exhibit 3–C is a contract, dated January 4, 1937, between Transkrit A. G. and Messrs. Neubauer, providing that Messrs. Neubauer order two new machines and stating "In this way, Messrs. Sigmund and Richard Neubauer have acquired the license for the United States of America."

Plaintiff's exhibit 3–D, also dated January 4, 1937, provides:

1. Messrs. Sigmund & Richard Neubauer will pay as single compensation for the delivery of the license (royalty) rights for the granting of License (Royalty) Rights for the United States of North America made by the Transkrit A.-G., Zurich, without guarantee, the amount of RM. 27,425.—.

It appears from subsequent correspondence between the two parties that there was no agreement as to the meaning of the contracts of January 4, 1937, insofar as the extent of the license granted is concerned.

The evidence establishes that the said agreements between Messrs. Neubauer and Transkrit A. G. have been assigned by Messrs. Neubauer to Transkrit Corporation, the sole stockholders of which are Fred Neubauer and Richard Neubauer.

Subsequent to the importation involved herein, an agreement was entered into between Transkrit Co. Dr. Hodler & Co. [apparently a successor to Transkrit A. G.] and Transkrit Corporation, dated December 15, 1948, granting to Transkrit Corporation an exclusive license in the United States and Canada and providing that Transkrit Corporation is to buy two additional machines. (Plaintiff's exhibit 3–L.)

At the trial Richard Neubauer, called as a witness on behalf of the plaintiff, testified that he is president of Transkrit Corporation; that the business of that concern is spot carbonizing for the printing trade; that the machines involved herein were purchased from Transkrit A. G.; that the price of the four machines was 48,000 RM plus the license fee of 40,000 RM; that Transkrit A. G. was the licensor and Transkrit Corporation the licensee; that the relationship of licensor and licensee existed prior to the purchase of these machines; that in accordance with that relationship, Transkrit A. G. could not sell these machines to other persons in the United States, and Transkrit Corporation could not buy them from any other concern except Transkrit A. G.; that Transkrit Corporation installed and operated the machines involved herein in its own place of business; that they were not sold or offered for sale in the United States; that to his knowledge, such or similar machines have never been sold or offered for sale in the United States.

On cross-examination, Mr. Neubauer testified that he paid 16,425 RM for one machine, previously imported, which included a printing unit; that he also paid 16,425 RM for the territorial rights; that another machine was sold as surplus from his firm in Germany for 11,000 RM; that when that machine was originally purchased from Transkrit A. G., 22,000 RM was paid; that he paid 22,000 RM for a third machine; that an old and repaired machine was purchased from the German firm for 10,000 RM; that when that machine was originally bought from Transkrit A. G., it cost 22,000 RM; that every time he bought a machine from Transkrit A. G., he had to pay 22,000 RM for the machine and the territorial rights; that he could not buy the machine unless he paid a license fee; that with each machine he got additional territorial rights; that—

The Transkrit, A. G. tried to sell us as many machines as they could, so they give us a small territory where we had, say, exclusive rights under the condition that we buy a machine. When we asked for the next territory, they said yes, if you buy a machine. So, as time went on, we had work for two machines, but we had to buy four machines.

He stated that he could not use those machines in any other territory; that he was allowed to deliver only within a certain territory; that he paid Transkrit A. G. a royalty of 5 per centum on all the business done with the machines; that under the first contract made on November 10, 1936 (plaintiff's exhibit 3–B), his firm had to take one machine for New York and one for Illinois; that it now has the whole of the United States and Canada.

The witness also testified:

Q.  How many machines were there?—A.  When I made this contract?

Q.  In 1936.—A.  With the two machines we already had, the whole of the United States, and in 1937 I bought these two machines and also at this time we had already the rights for the whole of the United States.

Q.  But when you brought these two additional machines in, there was no additional territory given to you?—A.  Yes.

Q.  And did you pay 22,000 Reichsmarks for the machines?—A.  When we made this agreement with Hodler, he did not give us the whole of the United States for just two machines.

Q.  I understand that   Now, let me ask you a question: In other words, they gave you a territory?—A.  Right.

Q.  You bought as many machines as were necessary to cover the territory, is that correct?—A.  At the time, I did not know how many machines would be necessary.

Q.  You bought as many machines as were necessary to cover the territory, is that right?—A.  Yes.

Q.  And every time you buy a machine, you pay 22,000 Reichsmarks?—A.  Yes.

\*       \*       \*       \*       \*   ,   \*       \*

Q.  If your business required it, you could buy as many machines as necessary?—A.  Right.

Q.  Without getting any additional territory for the United States, is that right?—A.  Yes.

Q.  And still you would pay 22,000 Reichsmarks?—A.  I don't know.

Q.  But up to the present time, you have paid 22,000 Reichsmarks?—A.  Right.

The witness also stated that the contract of January 4, 1937, gave him a license right in the United States; that nothing therein required that a minimum number of machines had to be purchased; that the contract of December 15, 1948, required a minimum of 10 machines before he would get a license to cover the whole of the United States; that subsequent to the signing of the 1937 agreement, there occurred correspondence which showed a difference of opinion about whether he had the rights once and for all, and Transkrit A. G. said that the two machines only gave an opportunity to work in the United States; that at the time these four machines were purchased, he was operating under the contract of 1937 which required no minimum amount of machines; that he paid 22,000 RM for each one.

There is no claim in this case that a foreign, export, or United States value existed for this merchandise; therefore, the issue is con-

fined to a determination of the cost of production. The only point of controversy is whether or not the so-called license fee of 10,000 RM per machine is a part of the cost of production.

It appears from the record that the machines were manufactured by Maschinen-Fabrik; that the patents were held by Transkrit A. G.; that Transkrit A. G. was the only firm which sold or offered to sell said machines; that on the sale of a machine, the purchaser was assigned a certain territory in which he was given exclusive rights; that the sum of 10,000 RM was paid for said rights; that Transkrit A. G. also received a royalty payment of 5 per centum of the sales price of the output of the machine.

The appellant claims that the agreements of January 4, 1937 (plaintiff's exhibits 3–C and 3–D), granted Messrs. Neubauer territorial rights in the entire United States and that, therefore, the sum of 10,000 RM was a part of the purchase price of the machines and not a payment for territorial rights.

However, the question here is not whether the sum of 10,000 RM is a part of the purchase price but whether it is a part of the cost of production as defined by section 402 (f) of the Tariff Act of 1930.

In support of its contentions, appellant has cited *International Forwarding Co.* v. *United States*, 17 C. C. P. A. (Customs) 86, T. D. 43377; *General Dyestuff Corp.* v. *United States*, 19 C. C. P. A. (Customs) 309, T. D. 45480; *Lionel Trading Co., Inc.* v. *United States*, 24 C. C. P. A. (Customs) 432, T. D. 48900.

In *International Forwarding Co.* v. *United States, supra,* a petition for remission of additional duties was denied on the ground that the importer, with full knowledge of the purpose of the payment of a royalty fee and without seeking information or advice from customs officials or disclosing the information in its possession, chose to stand upon the lower entered value. The court said (pp. 89–90):

> There is no question as to the dutiability of the $1,800. It was concededly a part of the purchase price. It was all paid upon the one transaction, and the machine could not have been bought except by the purchaser agreeing to so pay it.

This dictum is no indication that a license fee for territorial rights is a part of the cost of production.

In *General Dyestuff Corp.* v. *United States, supra,* it was held that a so-called royalty fee for the use of a patented process essential to be followed in using the article was a part of United States value as defined in section 402 (d) of the Tariff Act of 1922. The court stated that the merchandise was freely offered for sale in the United States to all purchasers in the usual wholesale quantities at a price which in every instance included the amount of the royalty fee. This holding does not establish that such an item is a part of the cost of production.

*Lionel Trading Co., Inc.* v. *United States, supra,* does involve an

appraisement on the basis of cost of production. The facts in that case were that Parfums Corday of Paris, the exporter, contracted with manufacturers to make boxes and bottles for it; that Corday furnished the designs which it produced or purchased from artists; that it owned and furnished the molds used in making the bottles; that the boxes and bottles were produced for the exclusive use of Corday and those who made them could not sell them to any other concern. The question was whether an item of 28 per centum of the entered value charged by Corday for permitting the importer to use the name "Corday" in the United States and to use the special designs in packing perfumes and toilet articles was a part of the cost of production of the boxes and bottles. The court said (p. 435):

> We are in agreement with the tribunal below in their holding that upon the record made, the said 28 per centum which was charged by Corday was, by the appraiser, properly added to the entered value to make up the cost of production which constituted the dutiable value. The record shows that the 28 per centum was added by Corday as profit and overhead. It seems obvious that a part of the cost of production of the bottles was in the making, producing, and furnishing the designs and moulds, and that a part of the cost of producing the boxes was the cost connected with the designs. These items clearly go into the cost of production of the merchandise under consideration. The term "in manufacturing or producing such or similar merchandise" in paragraph (1) of section 402 (f), *supra*, must be read in connection with the whole provision concerning cost of production.

In the instant case, however, Transkrit A. G. owned the patents of the machines but there is no evidence that it furnished Maschinen-Fabrik any plans or materials or that it incurred any expense in connection with the production of the machines.

In *United States* v. *F. B. Vandegrift & Co. et al., Kimble Glass Co.,* 26 C. C. P. A. 360, C. A. D. 42, it appeared that one Jakob Dichter was the sole owner of Ambeg Co., the German manufacturer of certain machines; that Kimble Glass Co. purchased the machines from Ambeg Co. for $1,800 per machine; that it also paid Jakob Dichter $1,200 per machine for the exclusive right to purchase such machines for export to the United States and for the exclusive right to manufacture and sell such machines in the United States and Canada. It was held that the sum of $1,200 was not part of the cost of production as defined in section 402 (f) of the Tariff Act of 1930.

*United States* v. *Guerlain, Inc.,* 28 C. C. P. A. 200, C. A. D. 146, involved perfumery bottles of distinctive design bearing the name "Guerlain," manufactured by Verreries Pochet et du Courval and by Cristalleries de Baccarat. It appeared that the importer was engaged in the sale and distribution of perfumes and toilet preparations which it purchased from Société Guerlain of Paris; that the only relationship existing between Société Guerlain and the bottle manufacturers was that of purchaser and seller of Guerlain bottles; that occasionally Société Guerlain filled a small order from its own stock,

charging the price it paid, plus overhead and profit; that since the bottles were designed solely for the Société Guerlain's perfume, there existed a "gentlemen's agreement" between the bottle manufacturers and the Société Guerlain that the manufacturers should sell only to such concerns as were approved by the Société Guerlain; that the manufacturers sold directly to customers; that the molds were ordered, made, and paid for by the manufacturers and were owned by them. It was held that Pochet and Baccarat were the manufacturers of the bottles within the meaning of section 402 (f) of the Tariff Act of 1930 rather than the Société Guerlain. The court said (p. 205):

> Although it is true that in the instant case the bottle manufacturers, Pochet and Baccarat by a "gentlemen's agreement," sell bottles to such concerns only as are approved by the Société Guerlain of Paris, and although it may be true that the Société Guerlain of Paris owns design patents for the bottles here involved, those facts, in our opinion, in view of the other facts and circumstances of record, hereinbefore set forth, are not of sufficient importance to warrant a holding that the Société Guerlain of Paris is the manufacturer and producer of the involved bottles, within the purview of section 402 (f), *supra*.

In the instant case Transkrit A. G. owned the patents but had nothing to do with the actual manufacturing of the machines. The fact that all orders for the purchase of the machines were transmitted through it to Maschinen-Fabrik does not make it the manufacturer or producer within the meaning of section 402 (f) of the Tariff Act of 1930. Therefore, the so-called license fee is not a part of the cost of production of the machines.

On the record herein, we make the following findings of fact:

1. That the importation consists of four machines, known as Transkrit machines, sold by Transkrit A. G. of Zurich, Switzerland, to Transkrit Corporation of New York.

2. That said machines were manufactured by Maschinen-Fabrik Augsburg-Nurnberg A. G. of Augsburg, Germany, who shipped the machines to Transkrit Corporation, and who was the sole manufacturer of such or similar machines.

3. That the machines were invented by one Ernst Hodler; that they were, at the time of exportation, covered by United States. Letters Patent; that the patents were owned by Transkrit A. G.

4. That Transkrit Corporation paid to Maschinen-Fabrik the sum of 88,000 RM for the said four machines, of which amount 40,000 RM was transmitted to Transkrit A. G.

5. That the 40,000 RM paid by the importer, Transkrit Corporation, to Transkrit A. G. through Maschinen-Fabrik was in payment for territorial rights in the United States.

6. That the 48,000 RM retained by Maschinen-Fabrik was in payment for producing and manufacturing the said four Transkrit machines.

7. That Transkrit machines such as or similar to those involved herein were never offered for sale or sold in the United States by any person, firm, or corporation.

8. That the cost of materials, fabrication, manipulation, or other process employed in the manufacture or production of these machines was 4,900 RM per machine; that the usual general expenses in the production of Transkrit machines were 5,700 RM; that packing costs were as shown on the invoice; and that the addition for profit was 1,400 RM per machine.

9. That the cost of production of each of the machines was 12,000 RM, plus packing, as entered.

We conclude, as a matter of law:

1. That there is no foreign, export, or United States value for the machines involved herein, as those terms are defined in section 402 of the Tariff Act of 1930.

2. That cost of production, as that value is defined in section 402 (f) of the Tariff Act of 1930, is the proper basis for determining the value of the instant merchandise.

3. That said cost of production for each of the machines was 12,000 RM, plus packing, as entered.

The decision and judgment below is affirmed and judgment will be rendered accordingly.